# RECORD NO. 16-1454

In The

# United States Court Of Appeals
# For The Fourth Circuit

## JOHN WESLEY HIGHTOWER,

*Plaintiff – Appellant,*

v.

## SAVANNAH RIVER REMEDIATION, LLC,

*Defendant – Appellee.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF SOUTH CAROLINA
### AT AIKEN

———————————

## BRIEF OF APPELLEE

———————————

George A. Reeves III
FISHER & PHILLIPS LLP
1320 Main Street, Suite 750
Columbia, South Carolina 29201
(803) 255-0000

*Counsel for Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __16-1454__    Caption: __John Wesley Hightower v. Savannah River Remediation, LLC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Savannah River Remediation, LLC__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                    ☑YES ☐NO
      If yes, identify all parent corporations, including all generations of parent corporations:

       AECOM, Bechtel National, Inc. and CH2M Hill

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                       ☑YES ☐NO
      If yes, identify all such owners:

       AECOM, Bechtel National, Inc. and CH2M Hill

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:


5. Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:


6. Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:


Signature: __s/ George A. Reeves III__    Date: ___January 25, 2017___

Counsel for: __Savannah River Remediation, LLC__


## CERTIFICATE OF SERVICE
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

I certify that on ___January 25, 2017___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:


__s/ George A. Reeves III__    ___January 25, 2017___
(signature)    (date)

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES .................................................................iv

I.  STATEMENT OF THE ISSUES ...................................................1

II. STATEMENT OF THE CASE ......................................................2

    A.  Relevant Facts ......................................................................2

        1.  SRR's Operations Generally.......................................2

        2.  Hightower's Employment with SRR ...........................2

        3.  SRR's Consolidation Efforts.......................................3

        4.  Hightower Takes Over New Responsibilities.............4

        5.  November 14, 2012 Incident.......................................6

        6.  Hightower Goes on Medical Leave ............................9

        7.  Lampley Meets with Employees and Human Resources .........10

        8.  Hightower Makes Complaints to EEO Office While on Medical Leave.................................................11

        9.  Hightower Returns from Leave ................................13

        10. Hightower Learns of Team's Concerns About His Management Style.................................................13

        11. Hightower Meets with EEO.....................................16

        12. Hightower is Presented with a Development Plan ..................16

        13. Hightower Does Not Accept the Development Plan and is Reassigned ................................................18

III. SUMMARY OF ARGUMENT.....................................................20

i

IV.   ARGUMENT...................................................................................21

A.   THE DISTRICT COURT CORRECTLY FOUND THAT HIGHTOWER FAILED TO PRESENT EVIDENCE OF PRETEXT REGARDING HIS TITLE VII DISCRIMINATION CLAIM ..................................................................................21

1.   Methods of Proof for Title VII Discrimination Claims...........21

a)   Burden-Shifting Under *McDonnell-Douglas* ................22

b)   Hightower's Burden to Establish Pretext .......................24

2.   Hightower Has Presented No Evidence that SRR's Reason Was False. ....................................................................24

3.   Hightower Has Presented No evidence that SRR Did Not Honestly Believe It's Reasons for Action Against Him...........26

4.   Hightower's Circumstantial Evidence Does Not Support an Inference of Race Discrimination ........................................28

a)   Hightower's Past Performance .......................................28

b)   Opinions of Co-Workers ................................................30

c)   Becker's Alleged Comments ..........................................31

d)   SRR's Alleged Treatment of Bishop and Walls.............33

e)   Previous Comments by Walls and Kolodziejczack........34

f)   The Title of Performance Improvement Plan/Development Plan ...................................................36

B.   THE DISTRICT COURT CORRECTLY FOUND THAT HIGHTOWER FAILED TO PRESENT EVIDENCE OF PRETEXT REGARDING HIS TITLE VII RETALIATION CLAIM ..................................................................................38

1.   Hightower's Evidence of Proximity Between Complaints and Development Plan is Insufficient.......................................39

2.     Hightower's Evidence Related to Work Hardening and Leave Carry Over Are not Relevant or Probative of Retaliation ................................................................................41

V.     CONCLUSION................................................................................42

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Brinkley v. Harbour Rec. Club*,
180 F.3d 598 (4th Cir. 1999) ...................................................................32, 35

*Brown v. GE Media, Inc.*,
2006 U.S. Dist. LEXIS 71407 (D.S.C. Sept. 29, 2006) ...............................24

*Dejarnette v. Corning, Inc.*,
133 F.3d 293 (4th Cir. 1998) .......................................................................27

*Desert Palace, Inc. v. Costa*,
539 U.S. 90 (2003)........................................................................................32

*Diamond v. Colonial Life & Accident Ins. Co.*,
416 F.3d 310 (4th Cir. 2005) .......................................................................23

*Dugan v. Albemarle Cty. Sch. Bd.*,
293 F.3d 716 (4th Cir. 2002) .......................................................................20

*Hawkins v. PepsiCo, Inc.*,
203 F.3d 274 (4th Cir. 2000) ...........................................................22, 29, 30

*Hazen Paper Co. v. Biggins*,
507 U.S. 604 (1993)......................................................................................21

*Hill v. Lockheed Martin Logistics Mgmt., Inc.*,
354 F.3d 277 (4th Cir. 2004) .......................................................................23

*Holder v. City of Raleigh*,
867 F.2d 823 (4th Cir. 1989) .......................................................................23

*Holland v. Wash. Homes, Inc.*,
487 F.3d 208 (4th Cir. 1998) ...........................................................22, 27, 39

*King v. Rumsfeld*,
328 F.3d 145 (4th Cir. 2003) ...........................................................22, 30

iv

*Koski v. Standex Int'l Corp.*,
    307 F.3d 672 (7th Cir. 2002) ........................................................32

*Lovelace v. Sherwin-Williams Co.*,
    681 F.2d 230 (4th Cir. 1982) ......................................................27

*Love-Lane v. Martin*,
    355 F.3d 766 (4th Cir.), *cert. denied*, 543 U.S. 813 (2004) ...................24, 25

*McDonnell-Douglas Corp. v. Green*,
    411 U.S. 792 (1973)...............................................................22, 39

*Miles v. Dell, Inc.*,
    429 F.3d 480 (4th Cir. 2005) ......................................................30

*O'Conner v. Consolidated Coin Caterers Corp.*,
    56 F.3d 542 (4th Cir. 1995) *reversed on other grounds*,
    517 U.S. 308 (1996)................................................................35

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989)................................................................32

*Raytheon Co. v. Hernandez*,
    540 U.S. 44 (2003).................................................................21

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133, 120 S. Ct. 2097 (2000) ............................................21, 23, 39

*Smith v. Flax*,
    618 F.2d 1062 (4th Cir. 1980) ....................................................27

*Smith v. Pepsi Bottling Group*,
    2007 U.S. Dist. LEXIS 65201 (D.S.C. Aug. 31, 2007), *aff'd*,
    271 Fed. Appx. 313 (4th Cir. 2008) .............................................27

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502, 113 S. Ct. 2742 (1993) ...........................................24

*Texas Dep't of Community Affairs v. Burdine*,
    450 U.S. 248, 101 S. Ct. 1089 (1981) ...........................................22, 24

**Statutes:**

42 U.S.C. § 2000(e) *et seq*. ("Title VII").........................................................*passim*

42 U.S.C. § 2000e-2(a)(1) ...............................................................................21

# I.    STATEMENT OF THE ISSUES

Appellee Savanah River Remediation (SRR) state the following issues
presented for review in this appeal:

I.      Did the District Court correctly dismiss Hightower's claim of race
discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C.
§ 2000(e) *et seq*. ("Title VII") where there was no evidence, circumstantial
or otherwise, demonstrating pretext in the employment actions complained
of by Hightower?

II.     Did the District Court correctly dismiss Hightower's claim of retaliation
under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq*.
("Title VII") where there was no evidence, circumstantial or otherwise,
demonstrating pretext in the employment actions complained of by
Hightower?

## II.    STATEMENT OF THE CASE

### A.    Relevant Facts

**1.    SRR's Operations Generally.** SRR is the liquid waste contractor at the Savannah River Site, which is owned by the United States Department of Energy ("DOE"). SRR was awarded management of the liquid waste disposition contract at the Savannah River Site effective July 1, 2009. Prior to that time, the liquid waste contractor was Westinghouse Savannah River Company. Liquid waste, which was generated at the Savannah River Site as a byproduct of processing nuclear materials, is stored in underground tanks in two tank farms operated by SRR. In addition to the tank farms, SRR also operates the Defense Waste Processing Facility ("DWPF"), the Effluent Treatment Facility ("ETF") and the Saltstone facility. Each of these operations works to process and store waste generated at the Savannah River Site. Over the course of his employment with SRR, Hightower has worked in most of these areas.

**2.    Hightower's Employment with SRR.** Hightower began his employment at the Savannah River Site in January of 1985 as an operator with E.I. Dupont. (J.A. p. 451). Following SRR being awarded management of the liquid waste contract from Westinghouse Savannah River Company, Hightower continued his employment at SRS as a Training Lead in DWPF. (J.A. pp. 451-452). Hightower has been employed as a Training Lead with SRR since 2009 and is currently

2

employed with SRR as a Training Advisor—a position that is in both the same technical training advisor ladder and in the same pay grade as a Training Lead. (J.A. pp. 449-450).

**3. SRR's Consolidation Efforts.** As the scope of SRR's work at the Savannah River Site has changed and funding has decreased, SRR has undergone a multiyear consolidation of its operations at the Savannah River Site in order to operate more efficiently. As part of this consolidation process, in 2011 SRR reassigned some of its management personnel. (J.A. pp. 339, 1139-1142). Hightower, who was the Training Lead for DWPF at the time, was approached by his Manager, Paul Shedd[1], and asked to take over a consolidated Training Lead role over Tank Farms and ETF. (J.A. pp. 422, 1141-1144). Shedd approached Hightower for the Tank Farms/ETF Training Lead position because Hightower performed well during the interview process for an open Training Manager position and because Shedd believed that the new role would be a good development path for Hightower as it would expose him to other areas of SRR's operations. (J.A. pp. 422, 425, 1143-1144). Shedd explained to Hightower that he believed that the new role would be a positive step for Hightower and that he believed that Hightower was capable of performing the job. (J.A. p. 1147).

---

[1] Around this same time, Hightower and three other employees had applied and interviewed for an open Training Manager position. (J.A. pp. 421, 711-712). That position was ultimately filled by Charles Lampley, a black male. (J.A. pp. 422, 713).

4.    **Hightower Takes Over New Responsibilities.** Prior to the consolidation in 2011, Glenn Bishop was the Training Lead for F Tank Farm, Jeff Becker was Training Lead for H Tank Farm, and Jack Bradley was Training Lead for Projects. (J.A. pp. 418, 726-727, 1142-1143).[2] F and H Tank Farms were consolidated and Bishop took Hightower's role as DWPF Training Lead and Becker continued on as a Training Lead in the Tank Farm/ETF area reporting to Hightower. (J.A. pp. 417-419, 726-727, 1142-1143). In his new role as Tank Farms/ETF Training Lead, Hightower reported to Charles Lampley, the Training Manager, who in turn, reported to Shedd.[3] (J.A. pp. 463-465).

Because he felt that the scope of his job increased as a result of the consolidation, Hightower approached Lavoris Curry, Deputy Human Resources Manager, about the expected job scope of the new position to determine if an increase in his pay grade or salary was warranted. (J.A. pp. 426-428). In response, Curry told Hightower that he would have to work in the position for a period of time to determine how much, if any, the scope of his job had increased and come back to discuss at a later time. (J.A. p. 429). Over the course of the following months, Hightower approached Lampley and Shedd and asked whether he was eligible for an increase in

---

[2] Becker, Bradley and Bishop are all white males.

[3] In his current position, Hightower still reports directly to Lampley and Shedd. (J.A. pp. 463-465).

4

pay grade or salary as a result of his new duties. (J.A. pp. 794-795, 1155-1156). In response to his repeated inquiries about a pay increase, in August of 2012, Hightower was asked to prepare documentation of the differences in scope of work between his new role as Tank Farm/ETF Training Lead and his former role as DWPF Training Lead. (J.A. pp. 429-430, 795). The purpose of the written description was to provide information to SRR's compensation personnel and senior management to determine if an increase in pay or grade was warranted. (J.A. pp. 795-797, 1155-1158). Hightower prepared a draft of what he believed to be the increased job scope and provided it to Lampley on or about August 27, 2012. (J.A. pp. 430, 795, 1274).

On November 5, 2012, Shedd sent an email to Kimberly Arlen, SRR Compensation Manager, requesting that Hightower's position be reviewed for a possible salary increase. (J.A. pp. 97, 134, 1167-1168, 1275). In that email, Shedd explained the circumstances surrounding the consolidation initiative and the resulting change in position for Hightower. Shedd explained how the duties of the former training leads had been consolidated and that he had monitored how Hightower's new role developed over the previous year and, concluded that Hightower's scope had increased. (*Id.*). Shedd concluded that while he was not suggesting an increase in salary grade level, he felt that an evaluation of Hightower's position for a pay increase was warranted. (*Id.*). In a follow up email on November 6, 2012, Shedd explained to Arlen that he did not know how Hightower's salary compared to that of the other

training leads in the same salary grade and identified those peers as Pat Harmon, Duane Tarver, Jack Bradley and Glenn Bishop.[4] (*Id.*). Arlen reviewed the compensation of Hightower's peers in the salary grade identified by Shedd and determined that he was being compensated above these individuals and above the median pay for the salary grade. (J.A. pp. 98, 107-108).

Based on her review of Hightower's pay in relation to his peers, as well as the information provided by Shedd regarding Hightower's job duties in the Tank Farms/ETF Training Lead position, Arlen did not believe that an increase in pay was warranted as SRR had undergone workforce reductions in the past few years and everyone was required to assume additional duties and work more efficiently. (J.A. pp. 98-102). Arlen told Shedd that the decision could "go either way" and that she left the decision to senior management's discretion. (J.A. pp. 98-99). Ultimately Patricia Allen, the Director of Environmental, Safety and Health, Quality Assurance, and Contractor Assurance, denied Hightower's request as upper management did not believe it was warranted based on Hightower's duties and because he was already above his peers within the pay scale. (J.A. pp. 100-101, 118, 797, 1159-1161).

**5.    November 14, 2012 Incident.** Between November 5, 2012 and November 14, 2012, the Facility Evaluation Board conducted a routine operations evaluation, referred to as an "op eval," on various operations within SRR's facilities

---

[4]  Harmon, Tarver, Bradley, and Bishop are white.

6

including the training methods being used in the simulator group in H Tank Farm. (J.A. pp. 485-486, 736-737, 1169-1170, 1277-1280). As a result of this op eval, some potential issues with how training was being conducted were noted in a documented Opportunity for Improvement ("OFI"). (J.A. pp. 171-172, 741, 1173-1176). The op eval specifically noted issues with two control room operators – Mike Walls and Steve Kolodziejczack. (J.A. pp. 487-490). After learning of the issue with the op eval, Hightower called a "time out" which put the op evals in progress, as well as the ongoing work in the simulator, on hold. (J.A. pp. 495-497). Hightower called the time out in order to address the issue raised in the OFI. (J.A. p. 497).

On November 14, 2012, Hightower discussed the OFI issues with Becker during a morning conference call and told him that he needed to meet with him that day. (J.A. pp. 500). The purpose of the meeting was to make Becker aware of what was going on as Becker would be in charge of the group while Hightower was on medical leave for surgery beginning the next day, November 15, 2012. (J.A. pp. 204, 498, 502-503). Additionally, Becker was in charge of the employees in the simulator group that were the subject of the OFI. (J.A. pp. 499, 501). Becker asked Hightower if the employees in the simulator group, in addition to the other employees in the group, could attend the meeting to discuss the changes that Hightower was proposing. (J.A. pp. 220-221, 501).

Later that day, a meeting was held and Hightower discussed the issues identified in the OFI regarding how evaluations were being conducted in the simulator group. (J.A. pp. 172-173, 485-486). During the meeting Kolodziejczack became defensive and told Hightower that he felt as though Hightower was questioning his integrity because he was one of the instructors who performed the evaluation at issue. (J.A. pp. 175-176, 491, 514-515). Hightower told Kolodziejczack that he did not understand why he was taking the issue personally and stated that these were the issues that were brought up in the OFI. (J.A. pp. 491, 516-517). Walls also became upset as Hightower continued on with the meeting and addressed other issues with how the op eval was conducted including whether or not an operator should have failed the evaluation carried out by Walls. (J.A. pp. 175-176, 517-519). Walls began cussing and raising his voice at Hightower, stood up from his chair and began walking toward the door of the meeting room to leave. (J.A. pp. 193, 519). As he did so, Walls continued to use profanity and raise his voice toward Hightower. (*Id.*). Becker, who was standing nearby, escorted Walls out of the meeting room. (*Id.*).

After the meeting ended, Hightower called Lampley and told him what happened during the meeting. (J.A. pp. 536, 727-728). During that conversation, Hightower told Lampley about Walls' conduct during the meeting. (J.A. pp. 536, 543-544, 555, 728, 734-735, 750). The following day, Hightower again spoke with Lampley about the events that took place in the meeting because he decided he wanted

to take disciplinary action against Walls and asked that Lampley contact human resources. (J.A. pp. 536, 543-544, 555, 728-729). Initially, Hightower had told Lampley that he did not want to take any action and that he did not want Lampley to get involved. (J.A. pp. 823-825). However, Hightower later came back to Lampley and said that he wanted to issue an informative contact to Walls. He then contacted Lampley once again and asked Lampley to issue a more formal corrective contact.[5] (J.A. pp. 729-730, 825-826). Lampley told Hightower that he would address the issue and discuss the situation more with Hightower after he returned to work from his upcoming medical leave. (J.A. pp. 539). After learning of the incident, Lampley notified Shedd of what occurred in the meeting. (J.A. pp. 773-774, 1168, 1177-1178).

    6.    **Hightower Goes on Medical Leave.** On November 15, 2012, the day following the incident with the simulator group, Hightower was scheduled to work only a half day as he was participating in a charity event that evening, Dancing with the Aiken Stars, and having surgery on his neck the following morning. (J.A. pp. 538, 761). Shedd and Lampley were aware of Hightower's planned medical leave in advance and did not indicate that he needed to reschedule his surgery in order to resolve the issues from the November 14th incident or otherwise question the timing of Hightower's leave. (J.A. pp. 1186-1187).

---

[5] Mike Walls was later issued a Constructive Contact for his actions in the meeting. (J.A. pp. 770-771, 1178).

**7.** **Lampley Meets with Employees and Human Resources.** On November 16, 2012, at Hightower's request, Lampley met with Hightower's group to discuss the issues that occurred during the November 14th meeting. (J.A. pp. 196-197, 751-752, 756-757, 1187-1188). During the meeting some of the employees who worked in Hightower's group complained of his management style and indicated that they did not want to work for him any longer. (J.A. pp. 197-198, 757-758, 783-784). Specifically, some employees complained that they did not feel that Hightower treated them fairly, that he created a stressful environment because he changed priorities often, and that he spoke down to them. (J.A. pp. 198-199, 557-558, 759-760). At least one of the employees in the group, Carol Sanderson, explained that she felt that Hightower created a "toxic environment" with his management style and had broken down in tears because of his management style. (J.A. pp. 786, 1061-1062).

After the meeting, Lampley met with Shedd and told him what he learned from his meeting with the group. (J.A. pp. 773-774, 1189-1190). Lampley explained to Shedd that before the meeting took place he was contacted by an operations manager in Tank Farm that told him that one of the members of Hightower's group, Sanderson, had called the working environment "toxic" due to the stress she was experiencing working under Hightower. (J.A. pp. 786, 1189-1190). Lampley also told Shedd that other members of the group discussed the stress that they were under working in the group, that they felt as though they were treated like children at times, that there were

frequent changes in priority with their work, and some specifically stated that they felt that Hightower's management style created the stressful environment. (J.A. pp. 759, 1189-1190). Some members of the group also approached Shedd and told him about the stress that they were under in the group. (J.A. pp. 1195-1202). They explained to Shedd that in the November 14th meeting they felt that the manner in which Hightower discussed the OFI was accusatory and questioned their integrity. (J.A. p. 1229).

Following his meeting with Hightower's group, Lampley contacted Ted Myers, Human Resources Director, to inform him of what was going on with the group, what happened in the November 14th incident, and Hightower's request that disciplinary action be taken against Walls. (J.A. pp. 761-762, 765-768, 871-875). Myers explained that any action that needed to be taken would take place after Hightower returned from medical leave. (J.A. pp. 767, 875-876). Although Shedd was not involved in the meetings and discussions with HR, Lampley continued to update Shedd on what was happening with his investigation and meetings with human resources. (J.A. pp. 775, 1193-1194).

**8.     Hightower Makes Complaints to EEO Office While on Medical Leave.** On or about November 19, 2012, Lampley called Hightower to check on him following his surgery. (J.A. pp. 574-575, 769). During this conversation, Hightower asked about Walls and the November 14th incident and Lampley only stated that there had been a meeting but that he could not discuss work with Hightower while he was

on medical leave. (J.A. pp. 578, 777-778). Although Hightower was not told any details of the meeting, Hightower repeatedly told Lampley that he knew nothing was going to happen to Walls and that he believed that he was going to be removed from his position. (J.A. pp. 578, 776-778).

After speaking with Lampley, Hightower called LaVoris Curry in human resources. Hightower explained to Curry what happened on November 14th and that Becker had told him that he had "lost credibility," that employees in the group did not want to work for him anymore, and that they were going to meet with Lampley. (J.A. p. 563). In his initial conversation with Curry,[6] Hightower stated that he only wanted to issue an informal contact to Walls but in a subsequent conversation with Curry, Hightower told her that he had thought more about it and wanted to issue a higher level of discipline. (J.A. pp. 293-294, 296-297). Curry responded that Hightower did not need to worry about the situation because he was on medical leave and that they could discuss it when he returned to work. (J.A. pp. 294, 297, 563).

On December 19, 2012, Lampley again contacted Hightower and told Hightower that he and Myers needed to meet with him when he returned to work on December 20th. (J.A. p. 571). Although Lampley did not go into any detail during that conversation, Lampley explained that the meeting was related to the November 14th

---

[6] Michelle Elam, a Human Resources Representative with SRR at the time, was also on the initial telephone call from Hightower. (J.A. pp. 296-297).

incident and not to worry because it would be good for him. (J.A. pp. 571-572). After this call, Hightower immediately called Stephanie Franklin, SRR's EEO Director. (J.A. pp. 568-569). During that conversation, Hightower told her that he needed to have a meeting with her when he returned to work about the November 14th incident. (*Id.*) Franklin asked Hightower to send her an email explaining the situation which he did the following morning. (J.A. p. 676).

9. **Hightower Returns from Leave.** On December 20, 2012, Hightower returned to work as scheduled. Prior to his scheduled meeting with Lampley and Myers, Hightower sent an email to Franklin at 6:31 a.m., in which he outlined what happened in the November 14, 2012 meeting. (J.A. p. 676). In this email, Hightower expressed his concern over Walls' conduct during that meeting and, for the first time, raised an issue with Becker allegedly making a comment that Hightower had "lost [his] credibility" and that he would not be able to lead his team. (J.A. p. 676). Hightower also referenced in the email for the first time that his dance partner for Dancing with the Aiken Stars was white, but made no allegation that Becker made any racial or discriminatory comments about race. (*Id.*). Hightower then forwarded the email to Karen Jenkins in SRR's EEO office before meeting with her at approximately 7:40 a.m. (J.A. p. 570).

10. **Hightower Learns of Team's Concerns About His Management Style.** Following his meeting with Jenkins, Hightower met with Lampley and Myers

13

later that morning as scheduled. (J.A. pp. 569, 774-775, 1203-1204). The purpose of the meeting was to discuss with Hightower the issues in his group and help him address those concerns. (J.A. pp. 910-911). During this meeting, which had been scheduled prior to Hightower contacting Franklin or Jenkins, Lampley and Myers shared with Hightower the complaints that Lampley had received from Hightower's team. (J.A. pp. 561-562, 580-581, 775-776, 878, 882-883, 919-920, 1223-1224). Myers and Lampley explained that they believed that Hightower needed to meet with his team and apologize for issues that had been caused by his management style. (J.A. pp. 581, 775-776, 888). Rather than accept any responsibility, Hightower denied the feedback that was being given to him.

Although Hightower did not agree with what he was being told about his management style, he ultimately agreed that he would apologize and Hightower was told to come up with a plan to address his team. (J.A. pp. 581-584, 778-783, 788, 888). Following that meeting, and prior to Hightower's expected return to the group, Lampley and Shedd met with Hightower's group and explained that Hightower would be returning as the training lead and that he and management had agreed on a path forward to attempt to resolve the issues that the group raised about Hightower's management style. (J.A. pp. 255-256, 1197-1199).

On January 6, 2013[7], Lampley sent an email to Hightower following up on the December 20th meeting and reminded him that his successful return as a training lead would require that he apologize to his group and commit to improving his relationship with them. (J.A. pp. 682, 803-806, 903-904, 910, 1224-1225, 1282). The intent of the email was to explain to Hightower what was required of him to remain in his assignment as training lead and confirm that Hightower understood from this email that he would be required to follow the agreed upon steps before being returned to his position. (J.A. pp. 614-615, 913-914, 921-922). Lampley also explained that he and Myers had come up with some suggestions regarding Hightower's approach and prepared some suggested talking points to consider. (*Id.*; J.A. pp. 803-806).

Lampley called Hightower after sending the email to discuss the contents with him. It was during this conversation that Hightower told Lampley he did not agree with the contents of the suggested approach because he was not going to apologize for something that he did not do. (J.A. pp. 584-585, 806-807). Lampley then planned to meet with Hightower when he returned to work the next day to discuss Hightower's issues with the items in the plan. (J.A. pp. 617-618, 808). That meeting, however, did not take place. On January 7, 2013, Franklin contacted Lampley and Shedd to inform

---

[7] Hightower did not work between December 21, 2012 and January 6, 2013, as SRR policy required that he use some of his excess vacation time that could not be carried over into the next year. (J.A. pp. 798-800, 1214-1216).

them that a complaint was made to EEO and that no action was to be made with the group during the investigation. (J.A. pp. 617-618, 808-809, 1238).

11. **Hightower Meets with EEO.** When Hightower returned to work on January 7, 2013, he met with Franklin to discuss the complaint that he had made with SRR's EEO office. (J.A. pp. 603, 619-620). During the meeting with Hightower, Franklin explained that she had conducted an investigation that included meetings with Walls, Becker and other members of Hightower's team and that some members of the team expressed concerns to her about Hightower's management style. (J.A. p. 620). The information provided to Franklin and her findings based on her investigation were consistent with the information that Lampley and Shedd received from their earlier meeting with the team.

12. **Hightower is Presented with a Development Plan.** When Hightower returned to work on January 14, 2014, he met with Myers and Lampley and they presented him with a Performance Improvement Plan. (J.A. p. 685).[8] That document, which was not a disciplinary document, was created by Myers after Hightower told Lampley that he would not offer an apology as was discussed in the December 20th meeting and set out in the January 3rd email. (J.A. pp. 807-811, 890-892, 926-927).

---

[8] From January 9, 2013 through January 13, 2013, Hightower was again out of work on leave following an incident in which he passed out at an Aiken County School Board Meeting on the evening of January 8, 2013. (J.A. pp. 628-629).

16

The Performance Improvement Plan stated that Hightower was being provided with the plan "because of a culmination of events and behaviors that are affecting [Hightower's] relationship with [his] co-workers", because some of the members of his group expressed concerns about Hightower's interpersonal skills and relationships, and because the EEO investigation reached the same conclusions and confirmed that Hightower had "displayed a pattern of unacceptable behaviors in leading [his] work group." (J.A. p. 685). The Performance Improvement Plan identified several objectives for Hightower to meet including: behaving in a professional manner with his peers, customers and clients; participating in behavioral and leadership assessment designed to improve leadership abilities; completing a 360 Degree Feedback Instrument; and reading one leadership book per quarter to further develop his leadership skills. (J.A. p. 685). Although the Performance Improvement Plan was not a disciplinary document and did not constitute a corrective action within SRR's disciplinary procedures, the Performance Improvement Plan explained that if Hightower failed to comply with the terms of the plan he would be removed from his position as a lead and reassigned to a position as an individual contributor. (*Id.*; J.A. pp. 685, 1238-1239). Hightower was instructed to review the Performance Improvement Plan, sign it and return it the following day. (J.A. pp. 630-632).

The following day, January 15, 2013, Hightower met with Lampley and stated that he had some concerns about the content of the Performance Improvement Plan

17

because he did not believe that he had a performance problem. (J.A. pp. 632-633). Lampley then presented Hightower with a revised version of the document which had been retitled as a Development Plan. (J.A. pp. 633, 686, 811-812, 923-924, 1245-1246). The Development Plan was also revised to state that EEO had confirmed that Hightower's management style "needed improvement" as opposed to his having displayed unacceptable behaviors as indicated in the previous version. (J.A. pp. 633-634, 686). All other terms of the Development Plan were, however, the same as the previous version. Nonetheless, Hightower still disagreed with the contents of the document as he did not believe that there was a problem with his management style. Although Hightower acknowledged that some of the members of the team were angry and upset with him, Hightower disagreed that his management style needed improvement. (J.A. p. 634). Like the Performance Improvement Plan, the revised Development Plan provided that Hightower could be removed from his position as a lead if he did not comply with the objectives identified in the plan and Hightower understood that his compliance was required. (J.A. p. 636). Finally, like the Performance Improvement Plan, the Development Plan was not considered a disciplinary document or part of the discipline process but was instead a development tool. (J.A. pp. 926-927).

**13.    Hightower Does Not Accept the Development Plan and is Reassigned.** Rather than sign that he agreed to the Development Plan, Hightower

chose to write a comment on the bottom of the document that read, "I acknowledge the receipt of this document and do not agree with all of its content." (J.A. pp. 686, 812). Shedd met with Hightower after he wrote this comment and told him that he thought that the way he signed it was not going to be acceptable to management. (J.A. p. 1249). Shedd tried to encourage Hightower to sign and accept the terms of the Development Plan so that he could get back to work as a Training Lead with his group. (J.A. p. 1249-1250). He explained that the Development Plan was not a punishment and that he had confidence in Hightower that he could repair the relationship with the team. (*Id.*) Hightower did not, however, sign and accept the terms of the Development Plan and, because management considered this to be a noncompliance with the terms of the Development Plan, Hightower was reassigned from his position as a team lead to a lateral training advisor role effective January 22, 2013. (J.A. pp. 815-816, 929-931, 1251).

Hightower is still employed in the training advisor position. As a training advisor, Hightower has received the same salary and benefits as he did when he was a training lead; he is the same pay grade and on the same job ladder; has worked in the same department, and has the same management chain as he did as a training lead. Becker, who had been performing the training lead functions during Hightower's absence, was placed in the role as an interim lead. Shedd announced the change in roles to the group via an email on January 22, 2013. (J.A. p. 687).

## III.   SUMMARY OF ARGUMENT

Hightower's appeal is an attempt to challenge a legitimate, non-discriminatory and non-retaliatory personnel decision with which he did not agree. Hightower is a current employee of SRR, and has been employed with the Company since 2009.  In 2013 Hightower was reassigned to a lateral position in the same pay grade, with the same salary and benefits, and within the same organizational unit after he was not willing to accept and sign the terms of a Development Plan. As set forth above, the Development Plan was the result of SRR discovering issues regarding his management style and the affect that his style had on some employees in his group.

The District Court correctly determined that Hightower failed to present circumstantial evidence of discrimination or retaliation, and, rightly refused to second-guess the legitimacy of the SRR's stated reason for its personnel decision. *See*, *Dugan v. Albemarle Cty. Sch. Bd*., 293 F.3d 716, 722-23 (4th Cir. 2002)("[I]t is not [the Court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's [adverse employment action]).

20

# IV.   ARGUMENT

## A.   THE DISTRICT COURT CORRECTLY FOUND THAT HIGHTOWER FAILED TO PRESENT EVIDENCE OF PRETEXT REGARDING HIS TITLE VII DISCRIMINATION CLAIM.

At issue in this appeal is whether or not the District court was correct to grant SRR's Motion for Summary Judgment. In order to survive summary judgment in a discrimination case under Title VII of the Civil Rights Act of 1964, Hightower must show that he was the victim of intentional discrimination. Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's [race or sex]." 42 U.S.C. § 2000e-2(a)(1).

### 1.   Methods of Proof for Title VII Discrimination Claims.

The ultimate question in a Title VII discrimination case, as with every employment discrimination case involving a claim of disparate treatment, is whether the plaintiff was the victim of intentional discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000). "Liability in a disparate treatment case depends on whether the protected trait . . . actually motivated the employer's decision." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (*quoting Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). To prove intentional discrimination under Title VII a plaintiff may proceed under two routes: (1) by direct evidence of discrimination, or (2) by circumstantial evidence using the shifting burdens of proof

21

established in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The District Court determined that Hightower had not presented any direct evidence of discrimination and, therefore, analyzed his claim using the *McDonnell-Douglas* framework.

### a)     Burden-Shifting Under *McDonnell-Douglas.*

Under the *McDonnell-Douglas* framework, Hightower must first establish a *prima facie* case of discrimination by proving four elements: (1) that he was a member of a protected class; (2) that he was performing at a level that met his employer's legitimate job expectations at the time of the adverse employment action; (3) that he suffered an adverse employment action; and (4) that he was treated differently than employees outside the protected class in similar situations. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

Assuming that Hightower establishes a *prima facie* case, then the burden shifts to SRR who must produce, but need not prove, a legitimate, non-discriminatory reason for the adverse employment action. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 278 (4th Cir. 2000). This burden is one of production, and not one of persuasion. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). Once SRR meets this burden of production, the burden shifts back to Hightower who must then prove that

SRR's proffered reason was mere pretext and that the real reason for the adverse action was discrimination. *Reeves*, 530 U.S. at 147.

Hightower's burden of demonstrating pretext "'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.'" *Id.* (quotations omitted). Throughout this analysis, Hightower bears the ultimate burden of proving he has been the victim of discrimination. *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 319 (4th Cir. 2005) (citations omitted). "'[T]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'" *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000)).

To demonstrate such an intent to discriminate by SRR, Hightower must produce sufficient evidence upon which one could find that "the protected trait . . . actually motivated the employer's decision." *Reeves*, 530 U.S. at 141 (internal quotation marks omitted). The protected trait "must have actually played a role in the employer's decision-making process and had a determinative influence on the outcome." *Id.* The pretext analysis "does not convert Title VII into a vehicle for challenging unfair – but nondiscriminatory – employment decisions." *Holder v. City of Raleigh*, 867 F.2d 823, 926-28 (4th Cir. 1989). "It is not enough to disbelieve the

[employer]." *Love-Lane v. Martin*, 355 F.3d 766, 788 (4th Cir.), *cert. denied*, 543 U.S. 813 (2004). Rather, "Plaintiff must show a reasonable jury could 'believe [his] explanation of intentional…discrimination.'" *Brown v. GE Media, Inc.*, 2006 U.S. Dist. LEXIS 71407, *9 (D.S.C. Sept. 29, 2006) (quoting *Love-Lane*, 355 F.3d at 788). The District Court correctly determined that Hightower did not met his burden of establishing pretext.

### b)    Hightower's Burden to Establish Pretext.

The Supreme Court of the United States has explained "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742 (1993) (*quoting Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089 (1981)). There is not a hint, much less evidence, of pretext in this case. The record fully supports the conclusion that Hightower did not meet his burden of establishing pretext because he has not shown that SRR's stated reason for its action was false, or that there is evidence that would raise any question of discrimination. (J.A. p. 1516).

### 2.    Hightower Has Presented No Evidence that SRR's Reason Was False.

It is undisputed that Hightower was issued a Development Plan following the November 14, 2012 incident and Hightower has admitted to the same. (J.A. pp. 633,

1506-1507). Hightower admits that he did not sign the Development Plan and disagreed with its terms. (J.A. pp. 639, 686, 1507-1508). He admits that he knew that if he complied and accepted the terms of the Development Plan that he would have returned to his assignment as training lead. (J.A. pp. 614-615, 636, 1507). Hightower admits that he was reassigned because he did not accept the Development Plan. (J.A. pp. 638, 1508). However, Hightower maintains his belief that he had no responsibility for what took place in the November 14, 2012 meeting and that he should accept no part of the responsibility, (J.A. p. 634) but does not offer any evidence that Lampley, Shedd or Myers shared his belief. Hightower's subjective belief of his own leadership abilities and performance is insufficient to show that SRR's reason for issuing a Development Plan was false. In *Love-Lane*, the United States Court of Appeals for the Fourth Circuit held that where there is substantial evidence that the defendants' articulated justifications for an adverse employment action were not pretext for race discrimination, plaintiff's unsupported opinion of improper discriminatory intent is not sufficient to establish pretext and withstand a defendants' motion for summary judgment. 355 F.3d at 789.

In this case, SRR presented substantial evidence that it issued a Development Plan to Hightower because of concerns raised regarding Hightower's management style. (J.A. pp. 1506-1508). Further, the evidence is clear that Hightower was reassigned solely because he refused to accept the Development Plan. (J.A. p. 1508).

The District Court properly concluded that Hightower's unsupported opinion was insufficient to establish pretext in light of SRR's evidence. (J.A. p. 1516). The District Court's decision should, therefore, be affirmed.

### 3. Hightower Has Presented No evidence that SRR Did Not Honestly Believe It's Reasons for Action Against Him.

Hightower further attempts to attack SRR's motivations by offering his opinion that SRR's management did not honestly believe that there was an issue with his management style. Contrary to Hightower's opinion, the record evidence in this matter establishes that Lampley and Shedd met with the members of Hightower's team after the November 14, 2012 incident and, in the process, learned that Hightower's leadership style was causing stress and problems with some employees in his group. (J.A. pp. 197-199, 557-558, 757-760, 783-786, 1061-1062, 1504-1507). The evidence further establishes that Becker, who worked in the same group, testified that some employees in the group did not like Hightower's management style. (J.A. pp. 197-199, 1504). Finally, the evidence establishes that Franklin conducted an independent investigation of Hightower's complaint and, through her interviews with employees, confirmed that Hightower's management style had a negative impact on some of the employees in his group. (J.A. pp. 620, 1506).

Despite this uncontroverted evidence, Hightower continues to refuse to accept SRR's decision to issue him a Development Plan because, in his opinion, there were *some* employees who did *not* have problems with his leadership style and enjoyed

working with him. However, this argument misses the point. Even if there were *some* employees who did not have a problem with his management style, there were others who *did*. Hightower has presented no evidence to show that Lampley, Shedd, Myers, or Franklin had any reason to doubt that *some* employees *did* have problems with his management style, or that they did not honestly believe that there were some employees who did not like his management style. *See Holland v. Washington Home Inc., supra* (in assessing pretext, a court's focus is on the perception of the decision maker, that is, whether the employer believed its stated reason was credible); *Dejarnette v. Corning, Inc.*, 133 F.3d 293 (4th Cir. 1998); *Smith v. Flax*, 618 F.2d 1062 (4th Cir. 1980).

Hightower invites this Court to speculate that, despite the evidence to the contrary, SRR's real motives were discriminatory. While a court is required to view facts in a light most favorable to the non-moving party, it is not required to join in speculation. *Smith v. Pepsi Bottling Group*, 2007 U.S. Dist. LEXIS 65201 (D.S.C. Aug. 31, 2007), *aff'd*, 271 Fed. Appx. 313 (4th Cir. 2008) ("Indeed, the court should draw reasonable inferences on behalf of the non-moving party, but it must not slip into 'sheer speculation.' The court may not move beyond inference and into the realm of mere conjecture") (quoting *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 242 (4th Cir. 1982)). Hightower has not established evidence of pretext to overcome SRR's legitimate and non-discriminatory reason for his reassignment and the District Court's decision to grant SRR's Motion for Summary Judgment should be affirmed.

27

4.    **Hightower's Circumstantial Evidence Does Not Support an Inference of Race Discrimination.**

On appeal Hightower argues that the District court failed to properly consider his circumstantial evidence of race discrimination. In the District Court's Order granting SRR's Motion for Summary Judgment, Judge Childs specifically quoted the portion of Hightower's Objections that set out the circumstantial evidence put forth by Hightower. (J.A. pp. 1514-1515). Like the Magistrate Judge, the District Judge considered Hightower's circumstantial evidence and found it insufficient to establish that SRR's stated reason for its action was pretext. On appeal, Hightower again identifies the same evidence that has previously been considered and rejected, and this Court should affirm the decision of the District Court as the evidence is not relevant or probative of discrimination.

a)    **Hightower's Past Performance.**

SRR has presented unequivocal testimony and evidence that some of Hightower's team members complained about his management style and that Hightower's managers believed that there were issues with Hightower's management style that needed improvement at the time that he was issued the Development Plan. (J.A. pp. 1504-1507). SRR's evidence also establishes that Hightower's managers were not aware of the leadership issues until the investigation that resulted from the November 14, 2011 incident. Hightower has admitted that management addressed these issues with him but he did not agree with his employees' or SRR's opinion of

28

the issues with his management style. (J.A. pp. 1505-1507). The evidence in this case is undisputed that Hightower was presented with a Development Plan and that he did not agree to its terms and would not sign the document. (*Id.*).

On appeal, Hightower continues to argue that SRR's reasons were pretext by relying on his own opinion of his performance, evidence of his past performance, and the opinion of employees who he supervised in the past. Each of these attempts must fail as it is well settled that it is the employer's opinion that is determinative. *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) (disregarding the plaintiff's opinions of [his] own performance because "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff")

SRR does not dispute that Hightower's job performance prior to the November 14, 2011 incident was satisfactory. In fact, Shedd's deposition testimony establishes that he relied upon Hightower's performance in the past as a Training Lead in DWPF when he selected Hightower over other candidates for the consolidated Training Lead position in 2010. (J.A. pp. 1141-1144, 1147). Hightower takes the position in his appeal that this past performance establishes that he was meeting expectations at the time he was issued the Development Plan. In doing so, Hightower notes that SRR focuses only on his reassignment to show that he was not meeting SRR's expectations and does not consider his past performance. Hightower is correct in noting SRR's focus as his performance *at the time* of the alleged adverse employment action is the

determinative question in a title VII discrimination. *See Miles v. Dell, Inc.*, 429 F.3d 480, 485 (4th Cir. 2005).

### b)     Opinions of Co-Workers.

In an attempt to dispute the District Court's determination that pretext does not exist, Hightower also relies on the opinions of former subordinates Rodney Bodiford and Wofford Brant who testified in their depositions that Hightower was a good manager when he supervised them *in the past*. He argues that this testimony demonstrates he was meeting SRR's legitimate expectations. However, Bodiford's opinion of Hightower's management lacks any probative value as to whether Hightower was meeting SRR's legitimate expectations at the time SRR issued the Development Plan and reassigned him after he refused to sign it because Hightower was not supervising Bodiford at the time of the Development Plan. *See, e.g., Hawkins*, 203 F.3d at 280 (rejecting plaintiff's own opinion of her performance and finding the opinions of plaintiff's co-workers "similarly close to irrelevant"); *King v. Rumsfeld*, 328 F.3d 145, 149-150 (4th Cir. 2003) (explaining that co-workers' opinions might be relevant in certain situations, but not where they fail to establish what expectations the employer had and whether the employee met them). Further, the testimony of these employees does not mitigate the fact that Shedd and Lampley received complaints from other employees who had problems with Hightower's leadership style. (J.A. p. 1504).

30

The record evidence establishes that Myers, Lampley and Shedd each believed, based on their investigation, that Hightower's management style was creating problems with some employees in Hightower's group. (J.A. pp. 1504, 1507). This belief was supported by the independent findings of SRR's EEO investigation. (J.A. p. 1506). While Hightower questions the legitimacy of EEO's investigation, he has presented no evidence that these members of management, or the EEO office, did not honestly believe that his management style needed improvement. Hightower may disagree with SRR's decision but his disagreement alone is insufficient to meet his burden of showing that he was meeting SRR's expectations at the time of any alleged adverse employment action, and the District Court was correct to hold that Hightower has not met his burden to establish pretext.

### c)     Becker's Alleged Comments.

The only statement that Hightower has identified that makes any reference to race is the alleged comment by Becker regarding Hightower participating in Dancing with the Aiken Stars with a white dance partner. However, Hightower has admitted that Becker never mentioned anything about his race or his partner's race. (J.A. pp. 509-511). Becker denied that he made any statement about Hightower losing credibility because of "Dancing with the Stars," but even if Hightower's allegations are taken as true for the purposes of this appeal, Becker's statement is an isolated statement, that does not mention race, made by someone who was a subordinate to

31

Hightower, about a non-work related social event in which Hightower was participating, and was wholly unrelated to SRR's decision to issue Hightower a Development Plan or reassign him because he refused to comply with the terms of the Development Plan. In sum, Becker's alleged comment is inconsequential.

While courts have recognized that isolated remarks can constitute evidence of discrimination, the statement, if true, must be made contemporaneously with the adverse employment action. *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999), abrogated on other grounds by *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). Furthermore, the comments must be made by someone related to the employment decision. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989)(O'Connor, J., concurring) (noting that "statements by non-decisionmakers, or statements by decisionmakers unrelated to the decisional process itself [do not] suffice to satisfy the plaintiffs burden" of proving discrimination); *Koski v. Standex Int'l Corp.*, 307 F.3d 672, 678 (7th Cir. 2002) (noting that the pertinent inquiry is whether the decisionmaker, as opposed to other managers or subordinates, evaluated the aggrieved employee based upon discriminatory criteria). Thus, assuming that Hightower's allegations that Becker made an isolated comment about the race of his dance partner is true, this statement is not direct evidence of discrimination based on race as it was not made contemporaneously with any adverse employment action.

Nor is this isolated comment, if true, probative of race discrimination in the decision to issue the Development Plan or reassign Hightower after he refused to sign the Development Plan. Although Hightower speculates that Becker was a driving force behind the decision, this is pure speculation. There is no evidence that Becker had any influence over Lampley, Shedd or Myers. Nor is there evidence that Lampley, Shedd or Myers consulted with Becker in making the decision. In sum, Hightower could not reasonably believe that Becker, who was a subordinate, had the ability to influence personnel decisions made by higher levels of management such as Lampley, Shedd and Myers. Thus, Becker's alleged comment about Hightower's participation in a dance event bears no nexus to the employment decisions at issue and are irrelevant to Hightower's claim of discrimination.

### d)    SRR's Alleged Treatment of Bishop and Walls.

Hightower further attempts to infuse race allegations into this matter, by arguing that the District Court disregarded his evidence that Walls, a Caucasian, acted in an insubordinate manner towards him; and that he had to write a job justification for a raise whereas Bishop, a Caucasian, did not. None of this evidence, even if true, is relevant to the issue of whether or not SRR's decision to issue Hightower a Development Plan for issues related to his management style was legitimate or based on race.

The evidence in this matter establishes that Walls was issued a written discipline for his insubordination – a level of discipline that is more severe than the Development Plan issued to Hightower. (J.A. pp. 770-771, 1178). Hightower further argues that he was treated less favorably than Bishop because he had to complete a job scope justification when he sought a salary increase but Bishop was not required to do so. This is a red-herring as the evidence in this case establishes that Hightower was chosen over Bishop for the Training Lead position that he occupied and Bishop was reassigned to Hightower's former lead position. (J.A. pp. 726-727, 1142-1143). Although Hightower felt that he should receive an increase of salary because of a perceived increase in the scope of his work in his position the Company ultimately reviewed his request and denied because management did not agree that the scope had increased in such a way to warrant an increase and because he was paid more than his peers—including Bishop—in the same salary grade. (J.A. pp. 100-101, 118, 797, 1159-1161). The record, including Hightower's own admissions, establishes that Bishop was paid less than Hightower and there is no evidence that Bishop approached management requesting an increase based on increased job duties as Hightower did and, therefore, no evidence that he was asked to prepare a justification.

### e) Previous Comments by Walls and Kolodziejczack.

In another attempt to inject race into his claim, Hightower focuses on the fact that two white employees—Walls and Kolodziejczack ("Kolo")—did not want to

work with him and called him a "son of bitch" to another employee. He infers, without any evidentiary support, that this was based on Hightower's race. Again, Hightower overlooks the consistent deposition testimony evidence that Walls and Kolo preferred working with supervisors who had served in the United States Navy's nuclear program as they had, and that they had problems working with other training leads—including white leads—in the past and that they wanted to do their work their own way. (J.A. pp. 205-209, 253-254, 265-268, 1347-1348, 1354-1355).

There is no evidence in the record that Walls and Kolo's comment or preference in working for other training leads had anything to do with race. Further, Walls and Kolo's alleged comments were made when Hightower was first transferred to the team over a year before the incident that led to the Development Plan. Finally, even if the comments were made by Walls and Kolo, the comments were made by subordinate employees and there is no evidence that either had authority to influence or direct disciplinary decisions of senior management or human resources. Comments by co-workers cannot be construed as evidence of discrimination, regardless of what was said, if the comments are not made by the person making the contested employment decision. *Brinkley v. Harbour Rec. Club*, 180 F.3d 598, 608 (4th Cir. 1999); *see also*, *O'Conner v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 549 (4th Cir. 1995) (there must be some nexus between the alleged discriminatory statements and the employer's employment decisions), *reversed on other grounds*, 517 U.S. 308 (1996).

**f)    The Title of Performance Improvement Plan/Development Plan.**

Finally, Hightower speculates as to the motives behind SRR renaming the "Performance Improvement Plan" to a "Development Plan." This theory was specifically considered and rejected by the Magistrate Judge because, as she noted, the title of the document was of no consequence. (J.A. pp. 1411-1412). The real issue was that Hightower refused to adhere to it.

In an attempt to cast doubt on the legitimacy of the Development Plan, Hightower focuses on the word "performance" and argues that Shedd did not honestly believe that Hightower had a "performance" issue and, therefore, one should have never been issued to Hightower in the first place. In support of this attempt, Hightower argues that Shedd testified that he did not believe that Hightower had performance issues. However, Hightower misconstrues Shedd's testimony to try to create an unsupported conclusion. Specifically, Shedd testified as follows:

> Q:    Some of the language that changes is obviously from a performance improvement plan to development plan. What are the differences in a performance improvement plan and a development plan?

> A:    I think—I think the terminology was important to Wesley because, you know, I think that the—in his mind, the performance improvement plan implied there was a performance—a performance issue. And this there—there really wasn't—it wasn't intended, as I mentioned earlier, Wesley was in terms of, you know, working hard and getting the job done, I mean, he's reliable. You can count on him to get the work done. So there should have

36

been no suggestion that there was a performance issue, and I think that was the difference.

(J.A. pp. 1245-1246). Hightower extrapolates from this that because Shedd did not believe that Hightower had a "performance" issue, a Performance Plan should not have been created in the first place, and any further revision to that document to call it a Development Plan was discriminatory.

Clearly, Shedd's testimony is that there was no issue with Hightower's "performance" in so far as that term is understood to mean work ethic or reliability in getting his work done. That, however, was not the issue raised by his co-workers or addressed with Hightower by SRR in the meetings and subsequent issuance of the Development Plan. The evidence in this case is clear that Hightower was not issued a Development Plan because he was unmotivated, lazy, or because he did not complete his work. Instead, the unequivocal evidence in this case establishes that Hightower was issued a Development Plan because SRR received complaints – which they believed to be valid – that his management style was causing problems with his team. (J.A. pp. 1504-1507). By citing to this isolated piece of testimony and suggesting that this is evidence that SRR did not honestly believe that he was not meeting their expectations is disingenuous as it avoids the real issue—Hightower's management style.

Nor is the change in title of this document evidence that SRR's motives for its action "shifted" as Hightower asserts. Rather, the reason for SRR's action was consistent throughout—Hightower's management style. Hightower has admitted that

37

this issue was identified to him as a problem at each stage of the process. It was the issue discussed in the December 20, 2012 meeting with Myers and Lampley when Hightower agreed to apologize to his team. It was specifically discussed again in Lampley's January 6, 2013 follow up email containing suggested talking points for his meeting with his team. It was set out in the Performance Improvement Plan after Hightower retracted his agreement to apologize to his team. Finally, the issue was set out in the Development Plan that was revised after Hightower objected to the reference to "performance."

Hightower attempts to argue that the inclusion of the term "performance" in the original version of the document and its later retraction, after he objected to it, evidences "shifting reasons" sufficient to establish pretext. In light of the evidence, coupled with Hightower's own admissions, that the only issue that was discussed with Hightower was his management style, no reasonable jury could conclude that renaming the document was pretext for discrimination. The District court correctly determined that Hightower's proffered circumstantial evidence was insufficient and the decision granting SRR's Motion for Summary Judgment should be affirmed.

## B.   THE DISTRICT COURT CORRECTLY FOUND THAT HIGHTOWER FAILED TO PRESENT EVIDENCE OF PRETEXT REGARDING HIS TITLE VII RETALIATION CLAIM.

The District Court's decision to grant SRR's Motion for Summary Judgment as to Hightower's retaliation claim should also be affirmed as Hightower has not

presented evidence that SRR's decision to reassign him after he refused to comply with the Development Plan was related to his complaints of discrimination.

A plaintiff may pursue a claim for retaliation under the burden-shifting framework of *McDonnell-Douglas* and its progeny. *Holland v. Wash. Homes, Inc*., 487 F.3d 208, 218 (4th Cir. 1998). To do so, Hightower must first establish a *prima facie* case of retaliation. *Id*. If he does so, the burden of production shifts to SRR to articulate a legitimate non-retaliatory reason for its actions. *Id*. Finally, if SRR articulates such a reason, Hightower must prove by a preponderance of the evidence that the proffered reason is actually a pretext for unlawful retaliation. *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 120 S. Ct. 2097, 2109 (2000).

In granting SRR's Motion for Summary Judgment, the District Court assumed without deciding that Hightower could establish a *prima facie* case. However, the District Court ultimately held that Hightower failed to establish that SRR's stated reason for its actions was pretext.

### 1.    Hightower's Evidence of Proximity Between Complaints and Development Plan is Insufficient.

On appeal, Hightower argues that the temporal proximity alone is sufficient to establish pretext. The District Court properly concluded that, based on the evidence, Hightower did not establish pretext. (J.A. pp. 1414-1415, 1518). The District Court was correct as the event that led to the issuance of the Development Plan—the complaints from coworkers—occurred *prior to* Hightower making any complaints to SRR. (J.A.

pp. 1414, 1518). Hightower has offered nothing more than proximity in time between his contact with the EEO office and Lampley's follow up communication with him clarifying SRR's policy regarding combining medical leave and vacation time.

The November 14th incident that led to the Development Plan occurred on the day before Hightower was scheduled to begin medical leave and set the subsequent events into motion. Lampley met with the group—at Hightower's request—and learned about the problems. Lampley then passed this information on to Myers and Shedd prior to any discussions with Hightower which were scheduled to take place as soon as he returned from medical leave. However, as soon as Hightower learned that he was to meet with Lampley and Myers, Hightower immediately contacted SRR's EEO office, while he was still on medical leave, and made a complaint. He then met with EEO personnel on the same morning of his meeting with Myers and Lampley. There is no evidence in the record that Lampley, Shedd or Myers were aware of Hightower's complaints until they received notice of the EEO complaint later in January. The record establishes that, by that time, Hightower had already met with Lampley and Myers and discussed the issues raised by the group and were attempting to work on a resolution. Ultimately, the decision to reassign Hightower came after he refused to sign and accept the Development Plan.

As the District Court noted, the majority of the evidence upon which Hightower relies to prove retaliation arose before he made an EEO complaint. (J.A. p. 1414).

Hightower's attempt to create an inference of retaliation in this case is insufficient as a jury could not ultimately find that his EEO complaint was the motivation for SRR's action as it is clear from the timeline set out above that there is no connection between the events.

### 2.    Hightower's Evidence Related to Work Hardening and Leave Carry Over Are not Relevant or Probative of Retaliation.

As for Hightower's arguments related to his participation in work hardening and use of excessive vacation, the District Court examined the evidence in detail and concluded that SRR established a legitimate non-retaliatory reason for its actions—SRR's policies. The District Court's detailed recitation of the events surrounding Hightower's leave, SRR's approval of his use of excess carry over vacation and medical leave, and the subsequent communications clarifying the Company's policy demonstrates that this evidence was fully considered. (J.A. pp. 1405, 1413, 1517-1518). Although Hightower argues that the District court failed to consider the evidence, it is clear that Hightower's objection is simply that the District Court did not view the evidence in the manner in which he had hoped.

## V.    CONCLUSION

Hightower offers only speculation that the decision to reassign him—or any other decision for that matter—was related to his race or his complaints. Absent evidence above his own speculation, the District Court correctly granted SRR's Motion for Summary Judgment as Hightower's claim of retaliation and that decision should be affirmed.

Respectfully submitted,

/s/ George A. Reeves III
George A. Reeves III
FISHER & PHILLIPS LLP
1320 Main Street, Suite 750
Columbia, South Carolina  29201
(803) 255-0000
greeves@fisherphillips.com

*Counsel for Defendant-Appellee
   Savanah River Remediation, LLC*

# CERTIFICATE OF COMPLIANCE

1.    This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

this document contains 9,932 words.

2.    This document complies with the typeface requirements because:

This document has been prepared in a proportional spaced typeface using Microsoft Word in 14 point Times New Roman.

Dated:  January 25, 2017          /s/ George A. Reeves III
                                                    George A. Reeves III

                                                    *Counsel for Appellee*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on January 25, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all the registered CM/ECF users.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Shelly N. Gannon
Shelly N. Gannon
GIBSON MOORE APPELLATE SERVICES, LLC
P.O. Box 1460
Richmond, VA  23218
(804) 249-7770
shelly@gibsonmoore.net